HANNAH WHEATLEY vs. PHILADELPHIA, WILMINGTON & BAL-
TIMORE RAILROAD COMPANY.

New Castle County, October Term, 1894.

**Master and Servant. Fellow Servant.** The fireman of one train and the
brakeman or flagman of another train, engaged in running trains on the same
division of a railroad are fellow servants. The railroad is not liable for injuries
resulting to one of them solely from the carelessness of the other.

**Same.**—The rule as to what constitutes the relation of fellow servants stated.

**Same. Negligence.**—If the negligence of the master combined with the negligence
of the fellow servant in causing the accident and injuries, then the master is
liable.

**Same. Duty of Master.**—The positive duties of the master defined.

This was an action brought by Hannah Wheatley, the widow
of William B. Wheatley, to recover damages for the death of her
late husband, caused as she alleges by the negligence of the defend-
ant company.

The material facts proved by the plaintiff are substantially as
follows:

William B. Wheatley died from injuries received in a collis-
ion of freight train No. 17, with the Norfolk Express passenger
train No. 97, at Porter's Station, on the Delaware Division of the
P., W. & B. R. R., on the morning of the 23rd day of August,
1893. Both trains were schedule trains, southbound from Wil-
mington to Delmar and used in operating the Delaware Division.
No. 97 was of superior class and had the right of way. Both were
equipped with engineer, fireman, conductor and brakemen.

William B. Wheatley, the deceased, was the fireman on express
train No. 97, and James A. Grubb, was the engineer. George W.
Calaway was the rear brakeman of train No. 17 and as such the
flagman thereof. On the night of August 22nd, 1893, owing to
an accident at St. Anne's Crossing and an unusual number of

peach trains, the northbound trains numbers 94 and 96 on the same division were several hours behind time, and the Newark " Y " was somewhat obstructed with peach cars for through trains.

Train No. 17 left Wilmington about ten o'clock on the night of that day, stopping at New Castle and Bear Station on the way down to shift cars, reaching Porter's Station about midnight As it approached Porter's Station, it was stopped by the red light on north distance signal which is 1000 feet north of the Delaware City railroad crossing. South of that signal it was again stopped by a red lantern swung at or near the north end of the station platform. Again it was stopped at the station by the target red light for orders, and was there ordered to switch off on the Newark " Y " and thereby give clear way to the express train No. 97 then about due. When the train stopped above the north distance signal, Calaway, the flagman, threw out a fuse, and when the order was given to switch off the train on the " Y " he went back a hundred yards or more to the rear of his train with his red lantern to protect the rear of his train from collision with the approaching Norfolk Express No. 97. He remained here until he thought his train had gotten off on the " Y " clear of the main track. Acting on that belief, he left his post of warning and went over to the rear of his train on the " Y." At the time he so left his post of warning, the following express train No. 97 was due at Porter's Station. Calaway's train in fact had not gotten clear of the main track, the engine, tender and two cars were still on that track when express No. 97, without notice of danger, with open throttle at full speed, dashed into the second car from the engine of train No. 17, with such force that the locomotive of the express train was hurled over backward and Wheatley, its fireman, was so injured in the wreck that he died the same day.

Under the rules of the Company, it was the duty of George W. Calaway, the rear brakeman and flagman of train No. 17, when his train stopped, immediately to go back with danger signals to stop train No. 97 moving in the same direction and at a point 600

yards from the rear end of his train, to place one torpedo on the rails; then back 1,200 yards from the rear of his train, and place two torpedoes on the rails ten yards apart; then to return to a point 900 yards from the rear end of his train, and there remain until recalled by the whistle of his engine; but if the train No. 97 was due within five minutes, then to remain at his post until that train arrived, even though he should be recalled by the whistles of his engine.

Calaway testified that he did not place the torpedo as required by the rules, and that he did not go back 900 yards from the rear of his train and remain there until train No. 97 had arrived, although he was well acquainted with the rules and knew that it was his duty to do so; but that he left his place of warning, and went to the rear of his own train, without giving the danger signal, upon the supposition or belief that his train was safely off on the "Y."

James A. Grubb, the engineer of express No. 97, testified that if the danger signal required by the rules had been given by Calaway, his train would have been stopped immediately. That no such signal was given.

It was proved that the distance signals at Porter's Station, one of which is located 1,000 feet north of the Delaware City crossing, and the other the same distance south of the crossing, were used only for the purpose of indicating the condition of the Newark and Delaware City Railroad, which intersects the Delaware Division at this point. That the target signal, which is located at the Station, is used only to stop trains for orders. It was further proved that each train when it went out carried with it the appliances and means, for giving signals of danger to an on-coming following train, whenever it might be stopped on the track at stations or elsewhere from any cause whatever—consisting of fuses and torpedoes to be used upon the track and the red danger signal lantern, all of which were to be used by the rear brakeman or flagman of the obstructing or stopped train, and further, that such peculiar

use of these respective signals was well known to the railroad employees, and governed them in the movement of their trains.

Upon this evidence the plaintiff rested his case.

*Massey*, for the defendant, moved for a non-suit, upon the ground that the only negligence proved in the case, either expressly or by reasonable legal inference, was that of George W. Calaway, whom they claim was a fellow servant with Wheatley, for whose negligence the defendant company cannot be held liable.

The doctrine that a master is not liable for an injury which is caused by the negligence of a fellow servant is frequently said to have been originated by Lord Abinger in *Priestley vs. Fowler*, 3 M. & W. 1. But the rule was not laid down in that case, though it was the necessary result of that decision. I contend that it had its origin in an American court, having been first distinctly stated in 1841 in *Murray vs. S. C. R. R. Co.*, 1 McMullan 385, where a fireman was injured by the negligence of an engine driver and the company was held not liable. In 1842 came the decision of *Farwell vs. B. and W. R. R. Co.*, 4 Metc. 49, in which the celebrated judgment of Shaw, C. J., was delivered, a case probably more cited in England than any other American case. The rule was not applied in English courts until 1850, in *Hutchinson vs. Y. N. & B. Ry. Co.*, 5 Excheq. 343. The rule as laid down by Shaw, C. J., was approved and affirmed in this state in *Flinn vs. P. W. & B. R. R. Co.*, 1 Houst. 496, 505.

The simple question in this case is whether Wheatley and Calaway were fellow servants within the meaning of the settled rules applicable to such cases. Wheatley was the fireman on one train, Calaway the flagman on another, both under the employ of the same company and engaged in the operation of its trains. The general rule is that when the master has selected proper and competent persons to do the work, and has furnished them with adequate materials and resources, he has performed his duty, and if, by reason of negligence of a person so selected, a workman is injured, it is not the negligence of the master ; 2 Thomp. Neg. 1026 ;

Argument.

*St. Louis, I. M. & S. Ry. Co. vs. Needham,* 63 Fed. Rep. 107 ; *Miller vs. So. Pac. R. R. Co.,* 20 Ore. 297; *Rose vs. Boston & Albany R. R. Co.,* 58 N. Y. 217, 221 ; *Randall vs. Baltimore & Ohio R. R. Co.,* 109 U. S. 478, 482; *Chicago, Milwaukee & St. Paul R. R. Co., vs. Ross,* 112 *id.* 377 ; *B. & O. R. R. Co. vs. Baugh,* 149 *id.* 569; *Northern Pacific R. R. Co. vs. Hambly,* 154 *id.* 349 ; Bailey, Master's Liability 229.

The question whether workmen are fellow servants depends upon the nature of the act in the performance of which an injury arises without regard to the grade or rank of the employee ; *Hutchinson vs. Y. N. & B. Ry. Co.,* 5 Excheq. 243 ; *Waller vs. South Eastern Ry. Co.,* 2 Hurlst. & Colt 102; *Morgan vs. V. of N. Ry. Co.,* 5 B. & S. 570; Bailey, Master's Liability 327.

The function of the court is clearly distinguishable from that of the jury. Whether negligence can be imputed is a question for the court. Whether it ought to be imputed is a question for the jury. In this case, as a matter of law, there is nothing from which negligence can be imputed; *Randall vs. B. and O. R. R. Co.,* 109 U. S. 478, 482; *Pleasance vs. Fant,* 22 Wall. 122; Patterson, Ry. Accident Law 448.

*John Biggs,* for the plaintiff.

I. Calaway was not a fellow servant of Wheatley. It is impossible to reconcile the decisions, but the principle that runs through them all is that the nature of the service is the criterion. If duties are delegated that belong to the principal then the person to whom they are delegated becomes a vice principal; 2 Thomp. Neg. 1,026; *Little Miami R. R. Co. vs. Stevens,* 20 Ohio 416; *Darrigan vs. N. Y. and N. E. R. R. Co.,* 52 Conn. 285; *Cooper vs. Pittsburg R. R. Co.,* 24 W. Va. 37.

Employees thus held to be vice principals are section boss; *Louisville R. R. Co. vs. Bowler,* 9 Heisk. 866; car repairer in charge of repairs ; *Moore vs. Wabash R.R. Co.,* 85 Mo. 588; conductor with respect to men working under his immediate orders; *Chicago, etc., R. R. Co. vs. Lundstrom,* 16 Neb. 254; boss

car repairer ; *Hannibal and St. Joseph R. R. Co. vs. Fox*, 31 Kan. 586 ; foreman of a gang to unload a vessel ; *Brown vs. Sennet*, 68 Cal. 225 ; a mate exercising authority over a deck hand ; *Dobb vs. Northern Pacific R. R. Co.*, 18 Fed. Rep. 625; s. c. 17 *id.* 67 ; foreman overseeing the distribution of rails; *Garraby vs. Kansas City Ry. Co.*, 25 *id.* 258 ; the conductor of one train with respect to the fireman of another; *Ragsdale vs. Northern Pacific R. R. Co.*, 42 Fed. Rep. 383 ; conductor having the control of switches ; *Mace vs. Northern Pacific R. R. Co.*, 57 *id.* 283 ; inspector and foreman with respect to a fireman killed by a mail catcher too near the track ; *Chicago and Alton R. R. Co. vs. Hoyt*, 31 Ill. 309 ; engineer with respect to fireman ; *Davies vs. Cent. Vt. R. R. Co.*, 55 Vt. 84.

The principle applies where there is an injury by the negligence of one whom the injured party is compelled to obey; *Cowell vs. Richmond etc., R. R. Co.*, 84 N. C. 309 ; *Douglas vs. Pacific R. R. Co.*, 63 Tex. 564; *Moore vs. Richmond etc., R. R. Co.*, 78 Va. 745 ; *Louisville etc., R. R. Co. vs. Collins*, 2 Duv. Ky. 214.

II. Where the negligence of the master and the servant coincides or is combined the master is liable. In this case it was the duty of the company either to get the freight train in or to stop the passenger train. If it were the duty of the superintendent at Clayton to give orders and he neglected to do so the defendant is liable. If it was the duty of the conductor to do this and he did not do it the defendant is liable. If the duty devolved alone upon Calaway the company is liable because he was a vice principal and not a fellow servant of the deceased. The duty devolved primarily upon the master and it cannot be delegated so as to relieve him from responsibility ; 1 Sherm. & Redf. Neg. The test by which to determine whether they were fellow servants was whether the thing done or omitted was the duty of the company ; Beach, Contrib. Neg. § 112 ; Wood, Master & Servant 438, n. 3. The deceased being a fireman under the orders of his conductor and Calaway a flagman on another train under the orders of another conductor they were not fellow servants; *Cooper vs. Mullan*, 1 Ga. 136. The reason

which underlies the rule subjecting an employee to the results of the negligence of a fellow servant is the opportunity of fellow servants to observe each other; *id.* 150.

The question whether the relation of fellow servant existed is one of fact for the jury; Wood, Master & Servant, 848 n.; *Hess vs. Phila. etc. Steamship Co.* 88 Pa. 269; *Indianapolis & St. L. R. Co., vs. Morgenstern,* 106 Ill. 216; *Chicago & N. W. R. R. Co. vs. Marandal,* 108 *id.* 576; *Mullen vs. Phila. etc., Steamship Co.,* 78 Pa. 25.

*George Gray,* for the defendant, replied.

LORE, C. J., delivered the opinion of the Court.

These contentions require the determination of two questions: 1. Were Wheatley and Calaway fellow servants. 2. Was there any negligence proved other than that of Calaway which may be imputed to the company.

1. No doctrine has given rise to so much confusion in judicial reports as the question as to what constitutes the relation of fellow servants, and there is no branch of the law so fraught with perplexity. Judge Bailey in his recent admirable work on " Masters' Liability for Injuries to Servants," page 229, says: " The authorities are so confused in determining who are fellow servants and upon what principle they should be determined that it requires a thorough acquaintance with the doctrine as recognized and declared by the courts of each State to properly apply the decisions of its courts to a given case."

In this State we are controlled by no adjudicated cases, and are therefore free to seek and find, if we may, the safe rule and reasonable solvent of these perplexities.

" It is a universal rule at common law that master or employer is not responsible to those engaged in his employment for injuries suffered by them as the result of the negligence of other servants in his employ and engaged in the same general service or employment;" Bailey 229.

" The general rule is that he who engages in the employment of another for the performance of specific duties for compensation takes upon himself the natural and ordinary risks and perils incident to the performance of such service, which include the carelessness and negligence of those who are in the same employment;" McKinney, Fellow Servants 18.

" The true test whether an employee occupies the position of a fellow servant to another employee or is the representative of the master is to be found not from the grade or rank of the offending or injured servant, but is to be determined by the character of the act being performed by the offending servant which caused the injury."

Let us ascertain the duty of the master as such. There are certain positive duties which the master must perform, " and the person who discharges any of these duties, no matter what his rank or grade, no matter by what name he may be designated, cannot be a fellow servant; he is an agent, and the rule applicable to principal and agent must apply; *id.* § 23.

Whenever the servant is doing work which attaches to and should be preformed by the master as such, he represents the master, and does not hold the relation of fellow servant to the other employe who may be injured by his negligence.

Therefore " where a master uses due diligence in the selection of capable and trustworthy servants, and furnishes them with suitable means to perform the service in which he employs them, he is not answerable to one of them for an injury received by him in consequence of the carelessness of another while both were engaged in the same service." *id.* § 9.

The duties of the master may be summed up as follows: He must furnish for his employes a reasonably safe place in which to work ; reasonably safe machinery and appliances with which to work ; he must exercise due care and caution in selecting competent and trustworthy co-workers; and it may be he should make and promulgate rules for the government of his establishment whenever it is so large or complicated, as to make his personal supervision

Del.]  WHEATLEY vs. P. W. & B. R. R. Co.  313

Opinion.

impracticable. These are the master's positive duties, negligence in meeting any of which makes the master liable. We think this is probably the extent of his liability. When the servant is performing any of these duties, he is the agent and representative of the master, and the master is liable to an injured employe for the negligence of the offending servant therein. When this rule does not apply, the co-employes are fellow servants and the master is not liable.

This is the doctrine as it now has become crystallized in the reports of the Supreme Court of the United States; beginning with the case of *Randall vs. B. & O. R. R. Co.*, 100 U. S. 482, and running through the cases of the *B. & O. R. R. Co. vs. Baugh*, 149 U. S. 369, *Northern Pac. E. R. Co. vs. Hambly*, 154 U. S. 349, and the latter cases in the United States Courts of Appeal. It is also the doctrine of the courts in the States of Pennsylvania, New York, Massachusetts, Maryland and a majority of the other States of the Union. Indeed we may say, of the overwhelming majority of all the well considered and well reasoned cases on this subject. It was uniformly the English doctrine prior to the statutes on this subject.

It is the one reasonable and philosophic rule that lifts us out of the uncertainty and confusion that has clouded this branch of the law, and furnishes us a uniform and clear test.

Apply this test to the case at Bar and see how easily the problem of the relation of Calaway and Wheatley to each other is solved. There is no proof that the place where Wheatley worked, that is, the road bed, track, etc., were not reasonably safe; there is no proof that the machinery and appliances with which he worked, that is, the engines, switches, etc., were not reasonably safe; there is no proof that reasonable care was not taken in selecting capable and skillful co-workers; indeed it is proved that Calaway had had seven years' experience; there is no proof that effective rules were not promulgated for the government of the employes; indeed it is in evidence that there were such rules, and that their observance on that very night and at Porter's Station had worked the safety of

both life and property with respect to this very train No. 17 and another train ahead of it.

Therefore from the evidence none, of these duties of the master appear to have been omitted.   It is apparent, therefore, that the duty of Calaway in signaling the train in no way related to any of these positive duties of the company, but was a duty ministerial in its character, and of executive detail in the operation on the road, which must of necessity be vested in the faithfulness of the employee.   This therefore fixes his position relative to Wheatley as that of fellow servant and not as the representative or agent of the master, and if his negligence alone caused the accident which resulted in the death of Wheatley the company cannot be held liable.

2. But it has been urged with great force and earnestness by the plaintiff's counsel, that even if Calaway was a fellow servant, and the accident was caused by reason of his negligence, that there was other negligence on the part of the defendant that combined with the negligence of Calaway in causing the injury, and therefore the defendant should be held.   This proposition is true if the evidence sustains it.

But is there any such proof in this case ?   We must be governed, not by conjecture, but by the proof.   The counsel has suggested that at the time of the accident the " Y " and the main track were to some extent obstructed and congested by reason of an accident at St. Anne's the day before, which had delayed peach and passenger trains and thus interferred with the safe operation of the road ; that the danger target signal at the station was not used; that the central agent at Clayton had not stopped No. 97 by orders, and other suggestions in this line.   After careful examination of the plaintiff's proof we are unable to find any evidence, which shows that these matters so suggested were in any wise the result of negligence on the part of the defendant, or that they in any respect were the proximate cause of the accident which resulted in Wheatley's death.

From the evidence of the plaintiff, it appears that the accident

resulted alone from the negligence of George W. Calaway while he was in the performance of duties, heretofore described, which were of executive detail in the operation of the road, and that in the performance of such duties we conclude that he was a fellow servant of Wheatley, and that the defendant is not liable for such negligence. It was Calaway's negligence, for which he is liable, but is not the negligence of the Company, and may not be imputed to it.

It is with great reluctance that courts take cases away from the jury, but where the evidence on the part of the plaintiff is such, that if a verdict is found for the plaintiff, the Court would be constrained to set it a side, it is not only reasonable but it is the duty of the Court to stop the case at that point. Such in our judgment is the case at bar.

We therefore order that non suit be entered.

The Court then directed the jury to bring in a verdict for the defendant, so that the opinion of the Court could be treated as if a charge to the jury, and subject to exception if desired.

*Verdict for the defendant.*